ANDREW L. PACKARD (State Bar No. 168690)
ERIK M. ROPER (State Bar No. 259756)
EMILY J. BRAND (State Bar No. 267564)
Law Offices of Andrew L. Packard
100 Petaluma Blvd. N., Suite 301
Petaluma, CA 94952
Tel: (707) 763-7227
Fax: (707) 763-9227
E-mail: Andrew@packardlawoffices.com
        Erik@packardlawoffices.com
        Emily@packardlawoffices.com

ROBERT J. TUERCK (State Bar No. 255741)
Jackson & Tuerck
P.O. Box 148
429 W. Main Street, Suite C
Quincy, CA 95971
Tel: (530) 283-0406
E-mail: bob@jacksontuerck.com

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING PROTECTION ALLIANCE

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation,<br><br>        Plaintiff,<br><br>    vs.<br><br>STEVE CAMERON, an individual, and ART RASMUSSEN, an individual,<br><br>        Defendants. | Case No. _____<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA"), by and through its counsel, hereby alleges:

I. **JURISDICTION AND VENUE**

1.      This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. Section 1251, *et seq.* (the "Clean Water Act"

COMPLAINT

1

1   or "the Act") against Mr. Steve Cameron and Mr. Art Rasmussen ("Defendants").  This

2   Court has subject matter jurisdiction over the parties and the subject matter of this action

3   pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C.   § 1365(a)(1)(A), and 28 U.S.C. §

4   1331 (an action arising under the laws of the United States).  The relief requested is

5   authorized pursuant to 28 U.S.C. § 2201-02 (power to issue declaratory relief in case of

6   actual controversy and further necessary relief based on such a declaration), 33 U.S.C. §§

7   1319(b), 1365(a) (injunctive relief), and 33 U.S.C. § 1319(d), 1365(a) (civil penalties).

8         2.     On or about August 9, 2011, Plaintiff provided notice of Defendants'

9   violations of the Act, and of its intention to file suit against Defendants, to the Administrator

10  of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA

11  Region IX; the Executive Director of the State Water Resources Control Board ("State

12  Board"); the Executive Officer of the Regional Water Quality Control Board, Central Valley

13  Region ("Regional Board"); and to Defendants, as required by the Act, 33 U.S.C.

14  § 1365(b)(1)(A).  A true and correct copy of CSPA's notice letter is attached as Exhibit A,

15  and is incorporated by reference.

16        3.     More than sixty days have passed since notice was served on Defendants and

17  the State and federal agencies.  Plaintiff is informed and believes, and thereupon alleges, that

18  neither the EPA nor the State of California has commenced or is diligently prosecuting a

19  court action to redress the violations alleged in this complaint.  This action's claim for civil

20  penalties is not barred by any prior administrative penalty under Section 309(g) of the Act,

21  33 U.S.C. § 1319(g).

22        4.     Venue is proper in the Eastern District of California pursuant to Section

23  505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located

24  within this judicial district.  Pursuant to Local Rule 120(d), intra-district venue is proper in

25  Sacramento, California because the source of the violations is located within Nevada

26  County.

27  //

28  //

COMPLAINT

## II.    INTRODUCTION

5.    This complaint seeks relief for Defendants' discharges of pollutants from an approximately 3-acre recyclable materials storage and waste transfer facility ("the Facility") owned and/or operated by Defendants.  Defendants allow pollution-contaminated storm water to discharge from the Facility to Wolf Creek.  Wolf Creek then flows into the Bear River, which ultimately flows into the Sacramento River and the Sacramento-San Joaquin Delta ("Delta").  Defendants' discharges of pollutants from the Facility are in violation of the Act and the State of California's General Industrial Permit for storm water discharges, State Water Resources Control Board ("State Board") Water Quality Order No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ and Water Quality Order No. 97-03-DWQ, National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001 ("General Permit" or "Permit").  Defendants' violations of the filing, monitoring, reporting, discharge and management practice requirements, and other procedural and substantive requirements of the General Permit and the Act are ongoing and continuous.

6.    The failure on the part of industrial facility operators such as Defendants to comply with the General Permit is recognized as a significant cause of the continuing decline in water quality of these receiving waters.  The general consensus among regulatory agencies and water quality specialists is that storm water pollution amounts to more than half the total pollution entering the marine environment each year.  With every rainfall event, hundreds of thousands of gallons of polluted storm water originating from industrial facilities discharge to the Sacramento River and the Sacramento-San Joaquin Delta.

## III.    PARTIES

7.    Plaintiff CALIFORNIA SPORTFISHING PROTECTION ALLIANCE ("CSPA") is a non-profit public benefit corporation organized under the laws of the State of California with its main office in Stockton, California.  CSPA has approximately 2,000 members who live, recreate and work in and around waters of the State of California, including the Wolf Creek, the Bear River, the Sacramento River and the Sacramento-San

Joaquin Delta.  CSPA is dedicated to the preservation, protection, and defense of the environment, and the wildlife and the natural resources of all waters of California.  To further these goals, CSPA actively seeks federal and state agency implementation of the Act and other laws and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

8.      Members of CSPA reside in California and use and enjoy California's numerous rivers for recreation and other activities.  Members of CSPA use and enjoy the waters of the Wolf Creek, the Bear River, the Sacramento River and the Sacramento-San Joaquin Delta, into which Defendants have caused, are causing, and will continue to cause, pollutants to be discharged.  Members of CSPA use these areas to fish, sail, boat, kayak, swim, birdwatch, view wildlife and engage in scientific study, including monitoring activities, among other things.  Defendants' discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments.  Thus, the interests of CSPA's members have been, are being, and will continue to be adversely affected by Defendants' ongoing failure to comply with the Clean Water Act.  The relief sought herein will redress the harms to Plaintiff caused by Defendants' activities.

9.      Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and the citizens of the State of California, for which harm they have no plain, speedy or adequate remedy at law.

10.     Plaintiff is informed and believes, and thereupon alleges, that Defendant Steve Cameron is the District Manager for the corporate entity that owns and/or operates the Facility, and in that capacity he manages operations of the Facility and has the authority necessary to change how storm water is managed at the Facility.

11.     Plaintiff is informed and believes, and thereupon alleges, that Defendant Art Rasmussen is the Facility Manager for the corporate entity that owns and/or operates the Facility, and in that capacity he manages the day to day operations and maintenance of the Facility.

12.     Accordingly, Defendants operate the Facility.

COMPLAINT

## IV.    **STATUTORY BACKGROUND**

13.    Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

14.    Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program.  33 U.S.C. §1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342.

15.    Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

16.    The State Board elected to issue a statewide general permit for industrial discharges.  The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

17.    The General Permit contains certain absolute prohibitions.  Discharge Prohibition A(1) of the General Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges"), which are not otherwise regulated by an NPDES permit, to the waters of the United States.  Discharge Prohibition A(2) of the General Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges to any surface or ground water that adversely impact human health or the environment.  Receiving Water

COMPLAINT

5

1   Limitation C(2) of the General Permit prohibits storm water discharges that cause or

2   contribute to an exceedance of any applicable water quality standards contained in a

3   Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

4       18.     In addition to absolute prohibitions, the General Permit contains a variety of

5   substantive and procedural requirements that dischargers must meet.  Facilities discharging,

6   or having the potential to discharge, storm water associated with industrial activity that have

7   not obtained an individual NPDES permit must apply for coverage under the State's General

8   Permit by filing a Notice of Intent ("NOI").  The General Permit requires existing

9   dischargers to file their NOIs before March 30, 1992.

10      19.     Effluent Limitation B(3) of the General Permit requires dischargers to reduce

11  or prevent pollutants in its storm water discharges through implementation of the Best

12  Available Technology Economically Achievable ("BAT") for toxic and nonconventional

13  pollutants and the Best Conventional Pollutant Control Technology ("BCT") for

14  conventional pollutants.  BAT and BCT include both nonstructural and structural measures.

15  General Permit, Section A(8).

16      20.     EPA has established Benchmark Levels as guidelines for determining

17  whether a facility discharging industrial storm water has implemented the requisite BAT and

18  BCT.  65 Fed. Reg. 64746, 64767 (Oct. 30, 2000).  The following benchmarks have been

19  established for pollutants discharged by Defendants:  pH – 6.0-9.0;  total suspended solids –

20  100 mg/L; oil & grease – 15.0 mg/L; chemical oxygen demand - 120 mg/L;  lead – 0.0816

21  mg/L;  copper – 0.0636 mg/L; zinc – 0.117 mg/L; aluminum – 0.75 mg/L; and, iron – 1.0

22  mg/L.  The State Water Quality Control Board has proposed adding a benchmark level for

23  specific conductance of 200 μmhos/cm.

24      21.     Dischargers must develop and implement a Storm Water Pollution

25  Prevention Plan ("SWPPP") before October 1, 1992.  The SWPPP must comply with the

26  BAT and BCT standards.  (Section B(3)).  The SWPPP must include, among other elements:

27  (1) a narrative description and summary of all industrial activity, potential sources of

28  pollutants and potential pollutants; (2) a site map showing facility boundaries, the storm

COMPLAINT

1  water conveyance system, associated points of discharge, direction of flow, areas of
2  industrial activities, and areas of actual and potential pollutant contact; (3) a description of
3  storm water management practices, best management practices ("BMPs") and preventive
4  maintenance undertaken to avoid storm water contamination that achieve BAT and BCT; (4)
5  the location where Significant Materials are being shipped, stored, received and handled, as
6  well as the typical quantities of such materials and the frequency with which they are
7  handled; (5) a description of potential pollutant sources including industrial processes,
8  material handling and storage areas, dust and particulate generating activities; (6) a summary
9  of storm water sampling points; (7) a description of individuals and their responsibilities for
10  developing and implementing the SWPPP (Permit, Section A(3)); (8) a description of
11  potential pollutant sources including industrial processes, material handling and storage
12  areas, and dust and particulate generating activities; (9) a description of significant spills and
13  leaks; (10) a list of all non-storm water discharges and their sources, and (11) a description
14  of locations where soil erosion may occur (Section A(6)).  The SWPPP must also include an
15  assessment of potential pollutant sources at the Facility and a description of the BMPs to be
16  implemented at the Facility that will reduce or prevent pollutants in storm water discharges
17  and authorized non-storm water discharges, including structural BMPs where non-structural
18  BMPs are not effective (Section A(7), (8)).

19        22.      The SWPPP must be re-evaluated annually to ensure effectiveness and must
20  be revised where necessary (Section A(9),(10)).  Section  C(3) of the General Permit requires
21  a discharger to prepare and submit a report to the Regional Board describing changes it will
22  make to its current BMPs in order to prevent or reduce any pollutant in its storm water
23  discharges that is causing or contributing to an exceedance of water quality standards.  Once
24  approved by the Regional Board, the additional BMPs must be incorporated into the
25  Facility's SWPPP.  The report must be submitted to the Regional Board no later than 60 days
26  from the date the discharger first learns that its discharge is causing or contributing to an
27  exceedance of an applicable water quality standard.  Section C(4)(a).  Section C(11)(d) of
28  the General Permit's Standard Provisions also requires dischargers to report any

COMPLAINT

noncompliance.  *See also* Section E(6).  Lastly, Section A(9) of the General Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

23.     The General Permit requires dischargers to eliminate all non-storm water discharges to storm water conveyance systems other than those specifically set forth in Special Condition D(1)(a) of the General Permit and meeting each of the conditions set forth in Special Condition D(1)(b).

24.     The General Permit requires dischargers commencing industrial activities before October 1, 1992 to develop and implement an adequate written Monitoring and Reporting Program no later than October 1, 1992.  Existing facilities covered under the General Permit must implement all necessary revisions to their monitoring programs no later than August 1, 1997.

25.     The General Permit also requires dischargers to submit "Annual Reports" to the Regional Board.  As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.  Dischargers must then conduct visual observations of these discharge locations for at least one storm per month during the wet season (October through May) and record their findings in their Annual Report.  Dischargers must also collect and analyze storm water samples from at least two storms per year.  Section B requires dischargers to sample and analyze during the wet season for basic parameters such as pH, total suspended solids ("TSS"), specific conductance, and total organic content ("TOC") or oil and grease, certain industry-specific parameters, and toxic chemicals and other pollutants likely to be in the storm water discharged from the facility.  Dischargers must also conduct dry season visual observations to identify sources of non-storm water pollution.  The monitoring and reporting program requires dischargers to certify, based upon the annual site inspections, that the facility is in

COMPLAINT

compliance with the General Permit and report any non-compliance, and contains additional requirements as well.

26.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.

27.     The term "discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12).  Pollutants are defined to include, among other examples, industrial waste, chemical wastes, biological materials, heat, rock, and sand discharged into water.  33 U.S.C. § 1362(6).

28.     A point source is defined as "any discernable, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).

29.     "Navigable waters" means "the waters of the United States."  33 U.S.C. § 1362(7).  Waters of the United States include tributaries to waters that are navigable in fact.   Waters of the United States include man-made water bodies that are tributary to waters that are navigable in fact.  Waters of the United States include ephemeral waters that are tributary to waters that are navigable in fact.

30.     Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants.  33 U.S.C. §§ 1365(a)(1) and (f), § 1362(5).  An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $32,500 per day for violations that occurred between March 15, 2004 and January 12, 2009, and an assessment of civil penalties of up to $37,500 per day for violations occurring after January 12, 2009, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365 and 40 C.F.R. §§ 19.1 - 19.4.

31.     The Regional Board has established water quality standards for the Sacramento River, the San Joaquin River, and the Sacramento-San Joaquin Delta in the

COMPLAINT

9

Water Quality Control Plan for the Sacramento River and San Joaquin River Basins, generally referred to as the Basin Plan.

32.     The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life."

33.     The Basin Plan establishes a standard for electrical conductivity in the Delta of 0.7 µmhos/cm from April 1 through August 31 and 1.0 µmhos/cm from September 1 through March 31.

34.     The Basin Plan provides that "[w]aters shall not contain chemical constituents in concentrations that adversely affect beneficial uses."

35.     The Basin Plan provides that "[a]t a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs)."  The waters of the San Joaquin River and the Delta have been designated by the State Board for use as municipal and domestic supply.

## V.     STATEMENT OF FACTS

36.     Defendants operate the Facility, an approximately 3-acre recyclable materials storage and waste transfer facility located at 13083 Grass Valley Ave., in Grass Valley, California.  Defendants allow pollution-contaminated storm water to discharge from the Facility to Wolf Creek, which in turn flows into the Bear River, and the Bear River ultimately flows into the Sacramento River, and the Sacramento-San Joaquin Delta.

37.     The Facility is classified under Standard Industrial Classification ("SIC") Code 4212 ("Motor Freight Transportation and Warehousing").  Industrial activities occur throughout the Facility.  The Facility is primarily used to receive, process, store, handle and distribute recyclable materials and other household wastes.  Other current industrial activities occurring at the Facility include the use, maintenance and storage of heavy machinery and motorized vehicles, including trucks used to haul materials to, from and within the Facility. Many of these activities occur outside in areas that are exposed to storm water and storm

COMPLAINT

flows due to the lack of overhead coverage, functional berms and other storm water controls. Plaintiff is informed and believes that Defendants' storm water controls, to the extent any exist, fail to achieve BAT and BCT standards.

38.     The management practices at the Facility are wholly inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States and fail to meet BAT and BCT.  The Facility lacks essential structural controls such as grading, berming and roofing to prevent rainfall and storm water flows from coming into contact with these and other sources of contaminants, thereby allowing storm water to flow over and across these materials and become contaminated prior to leaving the Facility.  In addition, the Facility lacks structural controls to prevent the discharge of water once contaminated.  The Facility also lacks an adequate filtration system to treat water once it is contaminated.

39.     During rain events, storm water laden with pollutants flows from the Facility into Wolf Creek, which in turn flows into the Bear River, and the Bear River ultimately flows into the Sacramento River, and the Sacramento-San Joaquin Delta.

40.     Information available to Plaintiff indicates that as a result of these practices, storm water containing pollutants harmful to fish, plant and bird life, and human health are being discharged from the Facility directly to these waters during significant rain events.

41.     Wolf Creek, the Bear River, the Sacramento River, and the Sacramento-San Joaquin Delta are waters of the United States.

42.     Information available to Plaintiff indicates that Defendants have not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.

43.     Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed to develop and implement an adequate Storm Water Pollution Prevention Plan.

44.     Information available to Plaintiff indicates the continued existence of unlawful storm water discharges at the Facility.

45.     Plaintiff is informed and believes, and thereupon alleges, that Defendants

COMPLAINT

1 have failed to develop and implement adequate monitoring, reporting and sampling
2 programs for the Facility.  Plaintiff is informed and believes, and thereupon alleges, that
3 Defendants have not sampled with adequate frequency, have not conducted visual
4 monitoring, and have not analyzed the storm water samples collected for the required
5 pollutant parameters.

6       46.      Plaintiff is informed and believes, and thereupon alleges, that all of the
7 violations alleged in this Complaint are ongoing and continuing.

8 **VI.**    **CLAIMS FOR RELIEF**

9 **FIRST CAUSE OF ACTION**
**Discharges of Contaminated Storm Water**
10 **in Violation of Permit Conditions and the Act**
**(Violations of 33 U.S.C. §§ 1311(a), 1342)**

11       47.      Plaintiff incorporates the allegations contained in the above paragraphs as
12 though fully set forth herein.

13       48.      Discharge Prohibition A(2) of the General Permit requires that storm water
14 discharges and authorized non-storm water discharges shall not cause or threaten to cause
15 pollution, contamination, or nuisance.  Receiving Water Limitations C(1) and C(2) of the
16 General Permit require that storm water discharges and authorized non-storm water discharges
17 shall not adversely impact human health or the environment, and shall not cause or contribute
18 to a violation of any water quality standards contained in a Statewide Water Quality Control
19 Plan or the applicable Regional Board's Basin Plan.

20       49.      Plaintiff is informed and believes, and thereupon alleges, that since at least
21 October 1, 1992, Defendants have been discharging polluted storm water from the Facility to
22 Wolf Creek, the Bear River, the Sacramento River, and the Sacramento-San Joaquin Delta,
23 in violation of the General Permit.

24       50.      During every significant rain event, storm water flowing over and through
25 materials at the Facility becomes contaminated with pollutants, flowing untreated from the
26 Facility to Wolf Creek, which in turn flows into the Bear River, and the Bear River
27 ultimately flows into the Sacramento River, and the Sacramento-San Joaquin Delta.

28

COMPLAINT

51.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing pollution and contamination of the waters of the United States in violation of Discharge Prohibition A(2) of the General Permit.

52.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitation C(1) of the General Permit.

53.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are contributing to the violation of the applicable water quality standards in the Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitation C(2) of the General Permit.

54.     Plaintiff is informed and believes, and thereupon alleges, that every day since March 30, 1992, Defendants have discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit.  Every day Defendants have discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a). These violations are ongoing and continuous.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

## SECOND CAUSE OF ACTION
### Failure to Develop and Implement an Adequate Storm Water Pollution Prevention Plan
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

55.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

56.     Section A and Provision E of the General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate Storm Water Pollution Prevention Plan ("SWPPP") no later than October 1, 1992.

57.     Defendants have failed to develop and implement an adequate SWPPP for the Facility.  Defendants' ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*, Defendants' outdoor storage of industrial materials, including waste materials, without appropriate best management practices; the continued

COMPLAINT

exposure of significant quantities of industrial material to storm water flows; the failure to either treat storm water prior to discharge or to implement effective containment practices; and the continued discharge of storm water pollutants from the Facility at levels in excess of EPA benchmark values and other applicable water quality standards.

58.     Each day since October 1, 1992 that Defendants have failed to develop and implement an adequate SWPPP for the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

59.     Defendants have been in violation of the SWPPP requirement every day since October 1, 1992.  Defendants continue to be in violation of the Act each day that they fail to develop and fully implement an adequate SWPPP for the Facility.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

## THIRD CAUSE OF ACTION
### Failure to Develop and Implement the Best Available
### And Best Conventional Treatment Technologies
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

60.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

61.     The General Permit's SWPPP requirements and Effluent Limitation B(3) require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.

62.     Plaintiff is informed and believes, and thereupon alleges, that Defendants have failed to implement BAT and BCT at the Facility for their discharges of total suspended solids, oil and grease, chemical oxygen demand, iron, aluminum, copper, zinc and other unmonitored pollutants in violation of Effluent Limitation B(3) of the General Permit.

63.     Each day since August 9, 2006 that Defendants have failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

64.     Defendants have been in violation of the BAT and BCT requirements every day

COMPLAINT

14

1   since at least August 9, 2006.  Defendants continue to be in violation of the BAT and BCT

2   requirements each day they fail to develop and fully implement BAT and BCT for the Facility.

3           WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

4

5                           **FOURTH CAUSE OF ACTION**
    **Failure to Develop and Implement an Adequate Monitoring and Reporting Program**
6           **(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

7           65.     Plaintiff incorporates the allegations contained in the above paragraphs as

8   though fully set forth herein.

9           66.     Section B of the General Permit requires dischargers of storm water associated

10  with industrial activity to develop and implement a monitoring and reporting program

11  (including, among other things, sampling and analysis of discharges) no later than October 1,

12  1992.

13          67.     Defendants have failed to develop and implement an adequate monitoring

14  and reporting program for the Facility.  Defendants' ongoing failures to develop and

15  implement adequate monitoring and reporting programs are evidenced by, *inter alia*, their

16  continuing failure to collect and analyze storm water samples from all discharge locations,

17  their continuing failure to analyze storm water samples for all toxic chemicals and other

18  pollutants likely to be present in the Facility's storm water discharges in significant quantities,

19  and their failure to file required reports with the Regional Board addressing Defendants' non-

20  compliance with the General Permit and how Defendants propose to achieve compliance with

21  the General Permit at the Facility.

22          68.     Each day since October 1, 1992 that Defendants have failed to develop and

23  implement an adequate monitoring and reporting program for the Facility in violation of the

24  General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C.

25  § 1311(a).  These violations are ongoing and continuous.

26          WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

27  //

28  //

COMPLAINT
                                        15

**FIFTH CAUSE OF ACTION**
**False Certification of Compliance in Annual Report**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

69.     Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

70.     Defendants have falsely certified compliance with the General Permit in each of the Annual Reports submitted to the Regional Board since August 9, 2006.

71.     Each day since at least August 9, 2006, that Defendants have falsely certified compliance with the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Defendants continue to be in violation of the General Permit's verification requirement each day that they maintain their false certification of their compliance with the General Permit.

WHEREFORE, Plaintiff prays for relief as hereinafter set forth.

**VII.    RELIEF REQUESTED**

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.    Declare Defendants to have violated and to be in violation of the Act as alleged herein;

b.    Enjoin Defendants from discharging pollutants from the Facility and to the surface waters surrounding and downstream from the Facility;

c.    Enjoin Defendants from further violating the substantive and procedural requirements of the General Permit;

d.    Order Defendants to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT and prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

e.    Order Defendants to comply with the General Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

f.    Order Defendants to prepare a SWPPP consistent with the General Permit's

COMPLAINT

16

1   requirements and implement procedures to regularly review and update the SWPPP;

2             g.   Order Defendants to provide Plaintiff with reports documenting the quality

3   and quantity of their discharges to waters of the United States and their efforts to comply with

4   the Act, the General Permit and the Court's orders;

5             h.   Order Defendants to pay civil penalties of $32,500 per day per violation for

6   all violations occurring after March 15, 2004, and $37,500 per day per violation for all

7   violations occurring after January 12, 2009, for each violation of the Act pursuant to Sections

8   309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d) and 1365(a) and 40 C.F.R. §§ 19.1 - 19.4

9   (pp. 200-202) (Dec. 31, 1996);

10             i.   Order Defendants to take appropriate actions to restore the quality of

11   navigable waters impaired by their activities;

12             j.   Award Plaintiff's costs (including reasonable attorney, witness, and

13   consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

14             k.   Award any such other and further relief as this Court may deem appropriate.

15

16

17   Dated: October 8, 2011            Respectfully Submitted,

18                                     LAW OFFICES OF ANDREW L. PACKARD

19

20                                     By:    /s/ Erik Roper_____
                                            Erik M. Roper
21                                          Attorneys for Plaintiff
                                            CALIFORNIA SPORTFISHING
22                                          PROTECTION ALLIANCE

23

24

25

26

27

28

COMPLAINT

17

**EXHIBIT A**



August 9, 2011

VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED
Steve Cameron, District Manager
Art Rasmussen, Facility Manager
Waste Management of California, Inc., dba, Waste Management of Nevada County
Waste Management Collection And Recycling, Inc., dba, Waste Management of Nevada County
Waste Management Recycling And Disposal Services Of California, Inc., dba, Waste Management of Nevada County
Waste Management Municipal Services Of California, Inc., dba, Waste Management of Nevada County
P.O. Box 1007
13083 Grass Valley Avenue
Grass Valley, CA 95945

C T Corporation System, Agent for Service of Process
Waste Management of California, Inc.
Waste Management Collection And Recycling, Inc.
Waste Management Recycling And Disposal Services Of California, Inc.
Waste Management Municipal Services Of California, Inc.
818 West 7th Street
Los Angeles, CA 90017

**Re:     Notice of Violations and Intent to File Suit Under the Federal Water
         Pollution Control Act**

Dear Mssrs. Cameron and Rasmussen:

   I am writing on behalf of the California Sportfishing Protection Alliance
("CSPA") in regard to violations of the Federal Water Pollution Control Act (commonly
referred to as the "Clean Water Act") ("the Act") occurring at the "Waste Management"[1]
recycling storage and waste transfer facility located at 13083 Grass Valley Avenue in
Grass Valley, California ("the Facility").  The WDID identification number for the
Facility is 5S29I014708.  CSPA is a non-profit public benefit corporation dedicated to the
preservation, protection, and defense of the environment, wildlife and natural resources
of Wolf Creek, Bear River, the Sacramento River, the Sacramento-San Joaquin River

---

[1] Within this Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act,
the term "Waste Management" is used to refer to: (i) Waste Management of California, Inc.; (ii) Waste
Management Collection And Recycling, Inc.; (iii) Waste Management Recycling And Disposal Services Of
California, Inc.; and, (iv) Waste Management Municipal Services Of California, Inc.

Notice of Violation and Intent To File Suit
August 9, 2011
Page 2 of 17

Delta and other California waters.  This letter is being sent to you as the responsible owner, officer, or operator of the Facility.  Unless otherwise noted, "Waste Management", Steve Cameron and Art Rasmussen shall hereinafter be collectively referred to as WMGV.

This letter addresses WMGV's unlawful discharges of pollutants from the Facility to Wolf Creek.  Wolf Creek then flows into the Bear River, which ultimately flows into the Sacramento River and the Sacramento-San Joaquin River Delta.  This letter addresses the ongoing violations of the substantive and procedural requirements of the Clean Water Act and National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 91-13-DWQ, as amended by Order No. 97-03-DWQ ("General Permit" or "General Industrial Storm Water Permit").

Section 505(b) of the Clean Water Act provides that sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Act (33 U.S.C. § 1365(a)), a citizen must give notice of intent to file suit.  Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("the EPA"), and the State in which the violations occur.

As required by the Clean Water Act, this Notice of Violation and Intent to File Suit provides notice of the violations that have occurred, and continue to occur, at the Facility.  Consequently, WMGV, Steve Cameron and Art Rasmussen are hereby placed on formal notice by CSPA that, after the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, CSPA intends to file suit in federal court against WMGV, Steve Cameron and Art Rasmussen under Section 505(a) of the Clean Water Act (33 U.S.C. § 1365(a)), for violations of the Clean Water Act and the General Permit.  These violations are described more fully below.

I.      **Background.**

WMGV owns and operates a recyclable materials storage and waste transfer facility located in Grass Valley, California.  The Facility is used to receive, store, handle and transport recyclable materials and other household wastes.  Other activities at the Facility include the use, maintenance and storage of heavy machinery and motorized vehicles, including trucks used to haul materials to, from and within the Facility.

On or about October 30, 1998, WMGV submitted its notice of intent to comply with the terms of the General Permit ("NOI").  WMGV's NOI reports that the Facility is classified solely as a local trucking facility under Standard Industrial Classification ("SIC") Code 4212 ("Local Trucking").  WMGV collects and discharges storm water from its approximately 3-acre Facility through at least three (3) discharge points to Wolf Creek.  Wolf Creek then flows into the Bear River, which ultimately flows into the Sacramento River and the Sacramento-San Joaquin River Delta ("the Delta").  The Delta

Notice of Violation and Intent To File Suit
August 9, 2011
Page 3 of 17

and its tributaries are waters of the United States within the meaning of the Clean Water Act.

The Central Valley Regional Water Quality Control Board (the "Regional Board" or "Board") has established water quality standards for the Sacramento River and the Delta in the "Water Quality Control Plan for the Sacramento River and San Joaquin River Basins," generally referred to as the Basin Plan.  The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that produce detrimental physiological responses in human, plant, animal, or aquatic life."  For the Delta, the Basin Plan establishes standards for several metals, including (at a hardness of 40 mg/L): arsenic – 0.01 mg/L; copper – 0.01; iron – 0.3 mg/L for iron; and zinc – 0.1 mg/L.  *Id*. at III-3.00, Table IIII-1.  The Basin Plan states that "[a]t a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain lead in excess of 0.015 mg/L."  *Id*. at III-3.00.  The Basin Plan also provides that "[t]he pH shall not be depressed below 6.5 nor raised above 8.5."  *Id*. at III-6.00.  The Basin Plan also prohibits the discharges of oil and grease, stating that "[w]aters shall not contain oils, greases, waxes, or other materials in concentrations that cause nuisance, result in a visible film or coating on the surface of the water or on objects in the water, or otherwise adversely affect beneficial uses."  *Id*. at III-5.00

The Basin Plan also provides that "[a]t a minimum, water designated for use as domestic or municipal supply (MUN) shall not contain concentrations of chemical constituents in excess of the maximum contaminant levels (MCLs)."  *Id*. at III-3.0.  The EPA has issued a recommended water quality criteria for aluminum for freshwater aquatic life protection of 0.087 mg/L.  EPA has established a secondary MCL, consumer acceptance limit for aluminum of 0.05 mg/L to 0.2 mg/L.  EPA has established a secondary MCL, consumer acceptance limit for zinc of 5 mg/L.  EPA has established a primary MCL, consumer acceptance limit for the following: chromium – 0.1 mg/L; copper – 1.3 mg/L; and lead – 0.0 (zero) mg/L.  *See* http://www.epa.gov/safewater/mcl.html.  The California Department of Health Services has also established the following MCL, consumer acceptance levels: aluminum – 1 mg/L (primary) and 0.2 mg/L (secondary); chromium – 0.5 mg/L (primary); copper – 1.0 (secondary); iron – 0.3 mg/L; and zinc – 5 mg/L.  *See* California Code of Regulations, title 22, §§ 64431, 64449.

EPA has also issued numeric receiving water limits for certain toxic pollutants in California surface waters, commonly known as the California Toxics Rule ("CTR").  40 CFR §131.38.  The CTR establishes the following numeric limits for freshwater surface waters:  arsenic – 0.34 mg/L (maximum concentration) and 0.150 mg/L (continuous concentration); chromium (III) – 0.550 mg/L (maximum concentration) and 0.180 mg/L (continuous concentration); copper – 0.013 mg/L (maximum concentration) and 0.009 mg/L (continuous concentration); lead – 0.065 mg/L (maximum concentration) and 0.0025 mg/L (continuous concentration).

The Regional Board has also identified waters of the Delta as failing to meet water quality standards for unknown toxicity, electrical conductivity, numerous

Case 2:11-cv-02663-WBS-KJN   Document 1   Filed 10/08/11   Page 22 of 38
Notice of Violation and Intent To File Suit
August 9, 2011
Page 4 of 17

pesticides, and mercury.  *See* http://www.swrcb.ca.gov/tmdl/docs/2002reg5303dlist.pdf.
Discharges of listed pollutants into an impaired surface water may be deemed a
"contribution" to the exceedance of CTR, a water quality standard, and may indicate a
failure on the part of a discharger to implement adequate storm water pollution control
measures.  *See Waterkeepers Northern Cal. v. Ag Indus. Mfg., Inc.*, 375 F.3d 913, 918
(9th Cir. 2004); *see also Waterkeepers Northern Cal. v. Ag Indus. Mfg., Inc.*, 2005 WL
2001037 at *3, 5 (E.D. Cal., Aug. 19, 2005) (finding that a discharger covered by the
General Industrial Storm Water Permit was "subject to effluent limitation as to certain
pollutants, including zinc, lead, copper, aluminum and lead" under the CTR).

        The General Permit incorporates benchmark levels established by EPA as
guidelines for determining whether a facility discharging industrial storm water has
implemented the requisite best available technology economically achievable ("BAT")
and best conventional pollutant control technology ("BCT").  The following benchmarks
have been established for pollutants discharged by WMGV:  total suspended solids – 100
mg/L; oil & grease – 15.0 mg/L; iron – 1.0 mg/L; aluminum – 0.75 mg/L; and,
nitrate+nitrite – 0.68 mg/L.  The State Water Quality Control Board has also proposed
adding a benchmark level for specific conductance of 200 $\mu$mhos/cm.  Additional EPA
benchmark levels have been established for other parameters that CSPA believes are
being discharged from the Facility, including but not limited to, arsenic – 0.16854 mg/L;
cadmium – 0.0159 mg/L; cyanide – 0.0636 mg/L; lead – 0.0816 mg/L; mercury – 0.0024
mg/L; and, silver – 0.0318 mg/L.

**II.    WMGV is Violating the Act by Discharging Pollutants From the Facility to
        Waters of the United States**

        Under the Act, it is unlawful to discharge pollutants from a "point source" to
navigable waters without obtaining and complying with a permit governing the quantity
and quality of discharges.  *Trustees for Alaska v. EPA*, 749 F.2d 549, 553 (9th Cir. 1984).
Section 301(a) of the Clean Water Act prohibits "the discharge of any pollutants by any
person . . ." except as in compliance with, among other sections of the Act, Section 402,
the NPDES permitting requirements.  33 U.S.C. § 1311(a).  The duty to apply for a
permit extends to "[a]ny person who discharges or proposes to discharge pollutants. . . ."
40 C.F.R. § 122.21(a).

        The term "discharge of pollutants" means "any addition of any pollutant to
navigable waters from any point source."  33 U.S.C. § 1362(12).  Pollutants are defined
to include, among other examples, a variety of metals, chemical wastes, biological
materials, heat, rock, and sand discharged into water.  33 U.S.C. § 1362(6).  A point
source is defined as "any discernable, confined and discrete conveyance, including but
not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are
or may be discharged."  33 U.S.C. § 1362(14).  An industrial facility that discharges
pollutants into a navigable water is subject to regulation as a "point source" under the
Clean Water Act.  *Comm. to Save Mokelumne River v. East Bay Mun. Util. Dist.*, 13 F.3d
305, 308 (9th Cir. 1993).  "Navigable waters" means "the waters of the United States."

Notice of Violation and Intent To File Suit
August 9, 2011
Page 5 of 17

33 U.S.C. § 1362(7).  Navigable waters under the Act include man-made waterbodies and any tributaries or waters adjacent to other waters of the United States.  *See Headwaters, Inc. v Talent Irrigation Dist.*, 243 F.3d 526, 533 (9th Cir. 2001).

The Delta and its tributaries are waters of the United States.  Accordingly, WMGV's discharges of storm water containing pollutants from the Facility are discharges to waters of the United States.

CSPA is informed and believes, and thereupon alleges, that WMGV has discharged and is discharging pollutants from the Facility to waters of the United States every day that there has been or will be any measurable flow of water from the Facility for the last five years.  Each discharge on each separate day is a separate violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These unlawful discharges are ongoing.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, WMGV is subject to penalties for violations of the Act since August 9, 2006.

**III.    Pollutant Discharges in Violation of the NPDES Permit.**

WMGV has violated and continues to violate the terms and conditions of the General Permit.  Section 402(p) of the Act prohibits the discharge of storm water associated with industrial activities, except as permitted under an NPDES permit such as the General Permit.  33 U.S.C. § 1342.  The General Permit prohibits any discharges of storm water associated with industrial activities that have not been subjected to BAT or BCT.  Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  BAT and BCT include both nonstructural and structural measures.  General Permit, Section A(8).  Conventional pollutants are TSS, O&G, pH, biochemical oxygen demand ("BOD"), and fecal coliform.  40 C.F.R. § 401.16.  All other pollutants are either toxic or nonconventional.  *Id.*; 40 C.F.R. § 401.15.

Further, Discharge Prohibition A(1) of the General Permit provides:  "Except as allowed in Special Conditions (D.1.) of this General Permit, materials other than storm water (non-storm water discharges) that discharge either directly or indirectly to waters of the United States are prohibited.  Prohibited non-storm water discharges must be either eliminated or permitted by a separate NPDES permit."  Special Conditions D(1) of the General Permit sets forth the conditions that must be met for any discharge of non-storm water to constitute an authorized non-storm water discharge.

Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the General Permit also prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of any applicable water quality

Notice of Violation and Intent To File Suit
August 9, 2011
Page 6 of 17

standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

As recently as October 19, 2010, the Regional Water Quality Control Board, Region 5, sent WMGV a letter ("the October 2010 letter") conveying its conclusion that, among other things, WMGV's 2009-2010 Annual Report contained evidence that the BMPs then in effect were not sufficient to reduce pollutant concentrations below EPA benchmark levels.  The October 2010 letter informed WMGV that its 2009-2010 Annual Report indicated storm water samples in excess of US EPA benchmark values for certain parameters.  Based on this evidence, the Board ordered WMGV to: (1) Review previously submitted Annual Reports and identify the number of consecutive years that the Facility has exceeded benchmark levels; (2) Identify sources of pollutants at the Facility that contributed to the exceedances; (3) Review current BMPs; (4) Modify existing BMPs or implement additional BMPs to reduce or eliminate discharge of pollutants; and (5) modify the SWPPP and Monitoring Plan for the Facility and maintain a copy of these required documents at the Facility.  Finally, the Board ordered WMGV to respond to these concerns by providing the Board a written response by no later than November 19, 2010.

Based on its review of available public documents, CSPA is informed and believes: (1) that WMGV failed to provide the Board the ordered written response by November 19, 2010; (2) that WMGV continues to discharge these very same pollutants in excess of benchmarks; and, (3) that WMGV has failed to implement BMPs adequate to bring its discharge of these and other pollutants in compliance with the General Permit. WMGV's ongoing violations are discussed further below.

### A.      WMGV Has Discharged Storm Water Containing Pollutants in Violation of the Permit.

WMGV has discharged and continues to discharge stormwater with unacceptable levels of Total Suspended Solids (TSS), Oil and Grease (O&G), Aluminum (Al), Chemical Oxygen Demand (COD), Copper (Cu), Iron (Fe) and Zinc (Zn) in violation of the General Permit.  These high pollutant levels have been documented during significant rain events, including the rain events indicated in the table of rain data attached hereto as Attachment A.  WMGV's Annual Reports and Sampling and Analysis Results confirm discharges of materials other than storm water and specific pollutants in violation of the Permit provisions listed above.  Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation."  *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

The following discharges of pollutants from the Facility have violated Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Industrial Storm Water Permit:

Notice of Violation and Intent To File Suit
August 9, 2011
Page 7 of 17

1. **Discharges of Storm Water Containing Total Suspended Solids (TSS) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Sampling Location | Parameter | Concentration in Discharge | EPA Benchmark Value |
|---|---|---|---|---|
| 02/23/2010 | NW Drain #1 | TSS | 205 mg/L | 100 mg/L |
| 01/08/2010 | Office Drain | TSS | 488 mg/L | 100 mg/L |
| 04/09/2009 | Drain #1 | TSS | 124 mg/L | 100 mg/L |
| 04/09/2009 | Drain #2 | TSS | 121 mg/L | 100 mg/L |
| 04/09/2009 | Drain #3 | TSS | 147 mg/L | 100 mg/L |

2. **Discharges of Storm Water Containing Oil and Grease (O&G) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Sampling Location | Parameter | Concentration in Discharge | EPA Benchmark Value |
|---|---|---|---|---|
| 10/05/2007 | Storm Drain # 1 | O&G | 16 mg/L | 15 mg/L |

3. **Discharges of Storm Water Containing Aluminum (Al) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Sampling Location | Parameter | Concentration in Discharge | Proposed Benchmark Value |
|---|---|---|---|---|
| 03/10/2011 | Drain #1 | Al | 3.68 mg/L | 0.75 mg/L |
| 03/10/2011 | Drain #2 | Al | 4.3 mg/L | 0.75 mg/L |
| 03/10/2011 | Drain #3 | Al | 4.84 mg/L | 0.75 mg/L |
| 01/13/2011 | Drain #1 | Al | 4.1 mg/L | 0.75 mg/L |
| 01/13/2011 | Drain #2 | Al | 6.96 mg/L | 0.75 mg/L |
| 01/13/2011 | Drain #3 | Al | 4.84 mg/L | 0.75 mg/L |
| 01/08/2010 | Office Drain | Al | 21 mg/L | 0.75 mg/L |
| 04/09/2009 | Drain #1 | Al | 11.4 mg/L | 0.75 mg/L |
| 04/09/2009 | Drain #2 | Al | 11.6 mg/L | 0.75 mg/L |
| 04/09/2009 | Drain #3 | Al | 16 mg/L | 0.75 mg/L |
| 01/02/2009 | Storm Drain # 3 | Al | 2.03 mg/L | 0.75 mg/L |
| 03/13/2008 | Storm Drain # 1 | Al | 0.78 mg/L | 0.75 mg/L |

Notice of Violation and Intent To File Suit
August 9, 2011
Page 8 of 17

4.   **Discharges of Storm Water Containing Chemical Oxygen Demand (COD) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Sampling Location | Parameter | Concentration in Discharge | Proposed Benchmark Value |
|------|-------------------|-----------|----------------------------|--------------------------|
| 01/08/2010 | Office Drain | COD | 281 mg/L | 120 mg/L |

5.   **Discharges of Storm Water Containing Copper (Cu) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Sampling Location | Parameter | Concentration in Discharge | EPA Benchmark Value |
|------|-------------------|-----------|----------------------------|---------------------|
| 01/08/2010 | Office Drain | Cu | 0.15 mg/L | 0.0636 mg/L |

6.   **Discharges of Storm Water Containing Iron (Fe) at Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Sampling Location | Parameter | Concentration in Discharge | EPA Benchmark Value |
|------|-------------------|-----------|----------------------------|---------------------|
| 03/10/2011 | Drain #1 | Fe | 2.78 mg/L | 1.0 mg/L |
| 03/10/2011 | Drain #2 | Fe | 2.95 mg/L | 1.0 mg/L |
| 03/10/2011 | Drain #3 | Fe | 3.18 mg/L | 1.0 mg/L |
| 01/13/2011 | Drain #1 | Fe | 2.37 mg/L | 1.0 mg/L |
| 01/13/2011 | Drain #2 | Fe | 4.05 mg/L | 1.0 mg/L |
| 01/13/2011 | Drain #3 | Fe | 2.62 mg/L | 1.0 mg/L |
| 02/23/2010 | NW Drain #1 | Fe | 1.74 mg/L | 1.0 mg/L |
| 02/23/2010 | Drain #2 | Fe | 2.11 mg/L | 1.0 mg/L |
| 01/08/2010 | Office Drain | Fe | 15.7 mg/L | 1.0 mg/L |
| 04/09/2009 | Drain #1 | Fe | 7.13 mg/L | 1.0 mg/L |
| 04/09/2009 | Drain #2 | Fe | 2.11 mg/L | 1.0 mg/L |
| 04/09/2009 | Drain #3 | Fe | 7.93 mg/L | 1.0 mg/L |
| 01/02/2009 | Storm Drain # 3 | Fe | 2.08 mg/L | 1.0 mg/L |

Notice of Violation and Intent To File Suit
August 9, 2011
Page 9 of 17

**7.     Discharges of Storm Water Containing Zinc (Zn) at
Concentrations in Excess of Applicable EPA Benchmark Value**

| Date | Sampling Location | Parameter | Concentration in Discharge | Proposed Benchmark Value |
|---|---|---|---|---|
| 12/12/2006 | Storm Drain # 1 | Zn | 0.145 mg/L | 0.117 mg/L |

CSPA's investigation, including its review of WMGV's analytical results documenting pollutant levels in the Facility's storm water discharges well in excess of EPA's benchmark values and the State Board's proposed benchmark for specific conductivity, indicates that WMGV has not implemented BAT and BCT at the Facility for its discharges of Total Suspended Solids (TSS), Oil and Grease (O&G), Aluminum (Al), Chemical Oxygen Demand (COD), Copper (Cu), Iron (Fe), Zinc (Zn) and other pollutants, in violation of Effluent Limitation B(3) of the General Permit.  WMGV was required to have implemented BAT and BCT by no later than October 1, 1992 of the start of its operations.  Thus, WMGV is discharging polluted storm water associated with its industrial operations without having implemented BAT and BCT.

CSPA is informed and believes that WMGV has known that its storm water contains pollutants at levels exceeding EPA Benchmarks and other water quality criteria since at least August 9, 2006.  CSPA alleges that such violations also have occurred and will occur on other rain dates, including during every single significant rain event that has occurred since August 9, 2006, and that will occur at the Facility subsequent to the date of this Notice of Violation and Intent to File Suit.  Attachment A, attached hereto, sets forth each of the specific rain dates on which CSPA alleges that WMGV has discharged storm water containing impermissible levels of Total Suspended Solids (TSS), Oil and Grease (O&G), Aluminum (Al), Chemical Oxygen Demand (COD), Copper (Cu), Iron (Fe), Zinc (Zn) and other unmonitored pollutants (e.g., Chemical Oxygen Demand) in violation of Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Permit.

These unlawful discharges from the Facility are ongoing.  Each discharge of stormwater containing any pollutants from the Facility without the implementation of BAT/BCT constitutes a separate violation of the General Permit and the Act.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, WMGV is subject to penalties for violations of the General Permit and the Act since August 9, 2006.

Notice of Violation and Intent To File Suit
August 9, 2011
Page 10 of 17

**B.    WMGV Has Failed to Implement an Adequate Monitoring & Reporting Plan.**

Section B of the General Industrial Storm Water Permit requires that dischargers develop and implement an adequate Monitoring and Reporting Plan by no later than October 1, 1992 or the start of operations.  Sections B(3), B(4) and B(7) require that dischargers conduct regularly scheduled visual observations of non-storm water and storm water discharges from the Facility and to record and report such observations to the Regional Board.  Section B(5)(a) of the General Permit requires that dischargers "shall collect storm water samples during the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season. All storm water discharge locations shall be sampled."  Section B(5)(c)(i) further requires that the samples shall be analyzed for total suspended solids, pH, specific conductance, and total organic carbon.  Oil and grease may be substituted for total organic carbon. Section B(5)(c)(ii) of the General Permit further requires dischargers to analyze samples for all "[t]oxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities."

As an initial matter, CSPA notes that WMGV's NOI only designates the Facility as conforming to SIC Code 4212 – an SIC Code which does not require sampling of additional analytical parameters found in Table D of the General Permit.  However, CSPA's investigation has revealed that the Facility in fact functions as, among other things, a storage facility for recyclable materials.  SIC Code 5093 governs facilities whose industrial activities include storage of recyclable materials.  WMGV's failure to accurately designate all SIC Codes applicable to the Facility constitutes yet another violation of the Act and the General Permit.

Further, based on its investigation, CSPA is informed and believes that WMGV has failed to develop and implement an adequate Monitoring & Reporting Plan.  First, based on its review of publicly available documents, CSPA is informed and believes that WMGV has failed to collect storm water samples during at least two qualifying storm events (as defined by the General Permit) during each of the past five years.  Second, based on its review of publicly available documents, CSPA is informed and believes that storm water discharges from the Facility at points other than the three sampling/discharge points currently designated by WMGV.  Each of these failures constitutes a separate and ongoing violation of the General Permit and the Act.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, WMGV is subject to penalties for violations of the General Permit and the Act since August 9, 2006.  These violations are set forth in greater detail below:

Notice of Violation and Intent To File Suit
August 9, 2011
Page 11 of 17

**1.      WMGV Has Failed to Collect Storm Water Samples from
          Each Discharge Point During at least Two Rain Events In
          Each of the Last Five Years.**

Based on its review of publicly available documents, CSPA is informed and
believes that WMGV has failed to collect storm water samples from all discharge points
during at least two qualifying rain events at the Facility during each of the past five years.
For example, CSPA notes that while the Annual Report filed by WMGV for the Facility
for the 2010-2011 Wet Season reported that WMGV analyzed samples of storm water
discharged during two qualifying storm events this past Wet Season, upon closer scrutiny
it turns out that neither of those storms were qualifying storm events within the meaning
of the General Permit (discussed further below).  Moreover, based on its investigation,
CSPA is informed and believes that storm water discharges from the Facility at points
other than the three sampling/discharge points currently designated by WMGV.  This
failure to adequately monitor storm water discharges constitutes separate and ongoing
violations of the General Permit and the Act.

**2.      WMGV Has Failed to Collect Samples of Storm Water from
          Each Facility Storm Water Discharge Location During at least
          Two Rain Events In Each of the Last Five Years as Required
          by the General Permit.**

The General Permit mandates that "Facility operators shall visually observe and
collect samples of storm water discharges from all drainage areas that represent the
quality and quantity of the facility's storm water discharges from the storm event."
General Permit, Section B.7.a.  Based on its investigation and review of publicly
available documents, CSPA is informed and believes that storm water discharges from
the Facility at points other than the three sampling/discharge points currently designated
by WMGV.  This failure to adequately monitor storm water discharges constitutes
separate and ongoing violations of the General Permit and the Act.

**3.      WMGV Is Subject to Penalties for Its Failure to Implement an
          Adequate Monitoring & Reporting Plan Since August 9, 2006.**

CSPA is informed and believes that available documents demonstrate WMGV's
consistent and ongoing failure to implement an adequate Monitoring Reporting Plan in
violation of Section B of the General Permit.  For example, while in its 2010-2011
Annual Report WMGV reported having collected samples of storm water discharged
during two qualifying storm events, neither of the two dates that WMGV reported having
collected samples of storm water were qualifying storm events.  First, with respect to the
storm that occurred at the Facility on March 10, 2011, it was not a qualifying storm event
within the meaning of the General Permit because publicly available precipitation records
demonstrate that enough rain fell on the Facility on each of the three preceding working
days at a level sufficient to cause storm water to discharge from the Facility.  Recall that
under the General Permit, a qualifying storm event is one that causes storm water to

Notice of Violation and Intent To File Suit
August 9, 2011
Page 12 of 17

discharge from a facility during scheduled operating hours and that occurs on a date preceded by at least three days without storm water having discharged from the site. General Permit, Section B.5.b.  Accordingly, given that it rained enough to produce a storm water discharge at the Facility each of the three days directly preceding March 10, 2011, the storm that occurred on March 10th was not a qualifying storm event.

Second, with respect to the storm that occurred at the Facility on January 13, 2011, based on CSPA's review of publicly available rainfall data, CSPA is informed and believes that storm was not a qualifying storm event because enough rain fell on the Facility each of the three days prior to likely result in a discharge of storm water from the Facility, thereby invalidating the January 13, 2011 storm as a qualifying storm event.

Accordingly, consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, WMGV is subject to penalties for these violations of the General Permit and the Act since August 9, 2006.

## C.      WMGV Has Failed to Implement BAT and BCT.

Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  BAT and BCT include both nonstructural and structural measures.  General Permit, Section A(8). CSPA's investigation indicates that WMGV has not implemented BAT and BCT at the Facility for its discharges of Total Suspended Solids (TSS), Oil and Grease (O&G), Aluminum (Al), Chemical Oxygen Demand (COD), Copper (Cu), Iron (Fe), Zinc (Zn) and other unmonitored pollutants in violation of Effluent Limitation B(3) of the General Permit.

To meet the BAT/BCT requirement of the General Permit, WMGV must evaluate all pollutant sources at the Facility and implement the best structural and non-structural management practices economically achievable to reduce or prevent the discharge of pollutants from the Facility.  Based on the limited information available regarding the internal structure of the Facility, CSPA believes that at a minimum WMGV must improve its housekeeping practices, store materials that act as pollutant sources under cover or in contained areas, treat storm water to reduce pollutants before discharge (e.g., with filters or treatment boxes), and/or prevent storm water discharge altogether. WMGV has failed to adequately implement such measures.

WMGV was required to have implemented BAT and BCT by no later than October 1, 1992.  Therefore, WMGV has been in continuous violation of the BAT and BCT requirements every day since October 1, 1992, and will continue to be in violation every day that it fails to implement BAT and BCT.  WMGV is subject to penalties for violations of the General Permit and the Act occurring since August 9, 2006.

Notice of Violation and Intent To File Suit
August 9, 2011
Page 13 of 17

D.    **WMGV Has Failed to Develop and Implement an Adequate Storm
       Water Pollution Prevention Plan.**

Section A(1) and Provision E(2) of the General Permit require dischargers of
storm water associated with industrial activity to develop, implement, and update an
adequate storm water pollution prevention plan ("SWPPP") no later than October 1,
1992.  Section A(1) and Provision E(2) requires dischargers who submitted an NOI
pursuant to Water Quality Order No. 97-03-DWQ to continue following their existing
SWPPP and implement any necessary revisions to their SWPPP in a timely manner, but
in any case, no later than August 1, 1997.

The SWPPP must, among other requirements, identify and evaluate sources of
pollutants associated with industrial activities that may affect the quality of storm and
non-storm water discharges from the facility and identify and implement site-specific
best management practices ("BMPs") to reduce or prevent pollutants associated with
industrial activities in storm water and authorized non-storm water discharges (General
Permit, Section A(2)).  The SWPPP must also include BMPs that achieve BAT and BCT
(Effluent Limitation B(3)).  The SWPPP must include: a description of individuals and
their responsibilities for developing and implementing the SWPPP (General Permit,
Section A(3)); a site map showing the facility boundaries, storm water drainage areas
with flow pattern and nearby water bodies, the location of the storm water collection,
conveyance and discharge system, structural control measures, impervious areas, areas of
actual and potential pollutant contact, and areas of industrial activity (General Permit,
Section A(4)); a list of significant materials handled and stored at the site (General
Permit, Section A(5)); a description of potential pollutant sources including industrial
processes, material handling and storage areas, dust and particulate generating activities,
a description of significant spills and leaks, a list of all non-storm water discharges and
their sources, and a description of locations where soil erosion may occur (General
Permit, Section A(6)).

The SWPPP also must include an assessment of potential pollutant sources at the
Facility and a description of the BMPs to be implemented at the Facility that will reduce
or prevent pollutants in storm water discharges and authorized non-storm water
discharges, including structural BMPs where non-structural BMPs are not effective
(General Permit, Section A(7), (8)).  The SWPPP must be evaluated to ensure
effectiveness and must be revised where necessary (General Permit, Section A(9),(10)).
Receiving Water Limitation C(3) of the Order requires that dischargers submit a report to
the appropriate Regional Water Board that describes the BMPs that are currently being
implemented and additional BMPs that will be implemented to prevent or reduce the
discharge of any pollutants causing or contributing to the exceedance of water quality
standards.

CSPA's investigation and review of available documents regarding conditions at
the Facility indicate that WMGV has been operating with an inadequately developed or
implemented SWPPP in violation of the requirements set forth above.  WMGV has failed

Notice of Violation and Intent To File Suit
August 9, 2011
Page 14 of 17

to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary. Accordingly, WMGV has been in continuous violation of Section A(1) and Provision E(2) of the General Permit every day since October 1, 1992, and will continue to be in violation every day that it fails to develop and implement an effective SWPPP.  WMGV is subject to penalties for violations of the Order and the Act occurring since August 9, 2006.

> **E.      WMGV Has Failed to Address Discharges Contributing to Exceedances of Water Quality Standards.**

Receiving Water Limitation C(3) requires a discharger to prepare and submit a report to the Regional Board describing changes it will make to its current BMPs in order to prevent or reduce the discharge of any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards.  Once approved by the Regional Board, the additional BMPs must be incorporated into the Facility's SWPPP.  The report must be submitted to the Regional Board no later than 60-days from the date the discharger first learns that its discharge is causing or contributing to an exceedance of an applicable water quality standard.  Receiving Water Limitation C(4)(a). Section C(11)(d) of the Permit's Standard Provisions also requires dischargers to report any noncompliance.  *See also* Provision E(6).  Lastly, Section A(9) of the Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

As indicated above, WMGV is discharging elevated levels of Total Suspended Solids (TSS), Oil and Grease (O&G), Aluminum (Al), Chemical Oxygen Demand (COD), Copper (Cu), Iron (Fe), Zinc (Zn) and other unmonitored pollutants that are causing or contributing to exceedances of applicable water quality standards.  For each of these pollutant exceedances, WMGV was required to submit a report pursuant to Receiving Water Limitation C(4)(a) within 60-days of becoming aware of levels in its storm water exceeding the EPA Benchmarks and applicable water quality standards.

Based on CSPA's review of available documents, WMGV was aware of high levels of these pollutants prior to August 9, 2006.  Likewise, WMGV has generally failed to file reports describing its noncompliance with the General Permit in violation of Section C(11)(d).  Lastly, the SWPPP and accompanying BMPs do not appear to have been altered as a result of the annual evaluation required by Section A(9).  WMGV has been in continuous violation of Receiving Water Limitation C(4)(a) and Sections C(11)(d) and A(9) of the General Permit every day since August 9, 2006, and will continue to be in violation every day it fails to prepare and submit the requisite reports, receives approval from the Regional Board and amends its SWPPP to include approved BMPs.  WMGV is subject to penalties for violations of the General Permit and the Act occurring since August 9, 2006.

**F.      WMGV Has Failed to File Timely, True and Correct Reports.**

Section B(14) of the General Permit requires dischargers to submit an Annual Report by July 1st of each year to the executive officer of the relevant Regional Board. The Annual Report must be signed and certified by an appropriate corporate officer. General Permit, Sections B(14), C(9), (10).  Section A(9)(d) of the General Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Industrial Storm Water Permit.  *See also* General Permit, Sections C(9) and (10) and B(14).

CSPA's investigation indicates that WMGV has signed and submitted incomplete Annual Reports and purported to comply with the General Permit despite significant noncompliance at the Facility.  For example, the 2009-2010 Annual Report filed by WMGV for the Facility reports that (1) WMGV collected samples of storm water discharged from the Facility from the first storm event of the Wet Season that produced a discharge during scheduled facility operating hours and (2) that the first storm event of the Wet Season that produced a discharge during scheduled facility operating hours occurred on January 8, 2010.  However, based on CSPA's review of publicly available rainfall data, CSPA believes it cannot possibly be true that January 8, 2010 was the first storm event of the 2009-2010 Wet Season that produced a storm water discharge during scheduled facility operating hours.  To wit, while publicly available rainfall data for the area indicates that on Friday, January 8, 2010, 0.0" of rain fell on the Facility, that same data indicates that Tuesday, October 13, 2009, i.e., when 0.25" of rain was recorded as having fallen on the Facility, was actually the first qualifying storm event of that season. Further calling the validity of the January 8th storm into question as a qualifying storm event, let alone the first one of that Wet Season, is the fact that publicly available rainfall data demonstrates that no rain fell on the Facility on that date.

The second "storm" that WMGV reported having collected samples of storm water discharge at the Facility during the 2009-2010 Wet Season allegedly occurred on February 23, 2010.  However, as with the January 8, 2010 "storm", publicly available precipitation data reveals that no rain fell on the Facility on February 23, 2010. Accordingly, CSPA is informed and believes that a qualifying storm event did not occur at the Facility on that date and WMGV's false reporting to the contrary constitutes yet another violation of the Act and the General Permit.

These are only a few examples of how WMGV has failed to file completely true and accurate reports.  As indicated above, WMGV has failed to comply with the Permit and the Act consistently for at least the past five years; therefore, WMGV has violated Sections A(9)(d), B(14) and C(9) & (10) of the Permit every time WMGV submitted an incomplete or incorrect annual report that falsely certified compliance with the Act in the past years.  WMGV's failure to submit true and complete reports constitutes continuous and ongoing violations of the Permit and the Act.  WMGV is subject to penalties for violations of Section (C) of the General Permit and the Act occurring since August 9, 2006.

Notice of Violation and Intent To File Suit
August 9, 2011
Page 16 of 17

**IV.     Persons Responsible for the Violations.**

CSPA puts "Waste Management"[2], Steve Cameron and Art Rasmussen on notice that they are the persons responsible for the violations described above.  If additional persons are subsequently identified as also being responsible for the violations set forth above, CSPA puts "Waste Management", Steve Cameron and Art Rasmussen on notice that it intends to include those persons in this action.

**V.      Name and Address of Noticing Party.**

Our name, address and telephone number is as follows:  California Sportfishing Protection Alliance, Bill Jennings, Executive Director; 3536 Rainier Avenue, Stockton, CA 95204; Phone: (209) 464-5067.

**VI.     Counsel.**

CSPA has retained legal counsel to represent it in this matter.  Please direct all communications to:

Andrew L. Packard
Erik M. Roper
Law Offices of Andrew L. Packard
100 Petaluma Boulevard, Suite 301
Petaluma, CA 94952
Tel. (707) 763-7227
Fax. (707) 763-9227
Email: Andrew@Packardlawoffices.com
        Erik@Packardlawoffices.com

And to:

Robert J. Tuerck
Jackson & Tuerck
P.O. Box 148
429 W. Main Street, Suite C
Quincy, CA 95971
Tel: 530-283-0406
Fax: 530-283-0416
E-mail:Bob@JacksonTuerck.com

---

[2] Within this Notice of Violations and Intent to File Suit Under the Federal Water Pollution Control Act, the term "Waste Management" is used to refer to: (i) Waste Management of California, Inc.; (ii) Waste Management Collection And Recycling, Inc.; (iii) Waste Management Recycling And Disposal Services Of California, Inc.; and, (iv) Waste Management Municipal Services Of California, Inc.

Notice of Violation and Intent To File Suit
August 9, 2011
Page 17 of 17

## VII.    Penalties.

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act subjects "Waste Management", Steve Cameron and Art Rasmussen to a penalty of up to $32,500 per day per violation for all violations occurring after March 15, 2004, and $37,500 per day per violation for all violations occurring after January 12, 2009, during the period commencing five years prior to the date of this Notice of Violations and Intent to File Suit.  In addition to civil penalties, CSPA will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law.  Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)), permits prevailing parties to recover costs and fees, including attorneys' fees.

CSPA believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit.  We intend to file a citizen suit under Section 505(a) of the Act against "Waste Management" and its agents for the above-referenced violations upon the expiration of the 60-day notice period.  If you wish to pursue remedies in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period.  We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

Bill Jennings, Executive Director
California Sportfishing Protection Alliance

**<u>SERVICE LIST</u>**

Lisa Jackson, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Jared Blumenfeld
Administrator, U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA, 94105

Eric Holder
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Dorothy R. Rice, Executive Director
State Water Resources Control Board
1001 I Street Sacramento, CA 95814
P.O. Box 100
Sacramento, CA 95812-0100

Pamela Creedon, Executive Officer
Regional Water Quality Control Board
Central Valley Region
11020 Sun Center Drive #200
Rancho Cordova, CA 95670-6114

**ATTACHMENT A**
**Notice of Intent to File Suit, WMGV (Grass Valley, CA)**
**Significant Rain Events,\* August 9, 2006 – August 9, 2011**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Oct. | 05 | 2006 | Sept. | 29 | 2007 | Nov. | 01 | 2008 | May | 04 | 2009 |
| Oct. | 06 | 2006 | Oct. | 05 | 2007 | Nov. | 02 | 2008 | May | 05 | 2009 |
| Nov. | 02 | 2006 | Oct. | 06 | 2007 | Nov. | 04 | 2008 | June | 03 | 2009 |
| Nov. | 03 | 2006 | Oct. | 10 | 2007 | Nov. | 09 | 2008 | June | 04 | 2009 |
| Nov. | 08 | 2006 | Oct. | 13 | 2007 | Nov. | 27 | 2008 | Sept. | 14 | 2009 |
| Nov. | 11 | 2006 | Oct. | 17 | 2007 | Dec. | 15 | 2008 | Oct. | 13 | 2009 |
| Nov. | 13 | 2006 | Oct. | 20 | 2007 | Dec. | 16 | 2008 | Oct. | 14 | 2009 |
| Nov. | 22 | 2006 | Nov. | 11 | 2007 | Dec. | 19 | 2008 | Oct. | 15 | 2009 |
| Nov. | 27 | 2006 | Dec. | 04 | 2007 | Dec. | 20 | 2008 | Oct. | 20 | 2009 |
| Dec. | 09 | 2006 | Dec. | 07 | 2007 | Dec. | 22 | 2008 | Nov. | 07 | 2009 |
| Dec. | 10 | 2006 | Dec. | 17 | 2007 | Dec. | 24 | 2008 | Nov. | 12 | 2009 |
| Dec. | 11 | 2006 | Dec. | 18 | 2007 | Dec. | 25 | 2008 | Nov. | 18 | 2009 |
| Dec. | 12 | 2006 | Dec. | 19 | 2007 | Dec. | 26 | 2008 | Nov. | 21 | 2009 |
| Dec. | 13 | 2006 | Dec. | 20 | 2007 | Jan. | 02 | 2009 | Nov. | 28 | 2009 |
| Dec. | 14 | 2006 | Dec. | 28 | 2007 | Jan. | 03 | 2009 | Dec. | 07 | 2009 |
| Dec. | 15 | 2006 | Dec. | 29 | 2007 | Jan. | 22 | 2009 | Dec. | 11 | 2009 |
| Dec. | 22 | 2006 | Dec. | 30 | 2007 | Jan. | 23 | 2009 | Dec. | 12 | 2009 |
| Dec. | 27 | 2006 | Jan. | 04 | 2008 | Jan. | 24 | 2009 | Dec. | 13 | 2009 |
| Dec. | 28 | 2006 | Jan. | 05 | 2008 | Jan. | 25 | 2009 | Dec. | 14 | 2009 |
| Jan. | 04 | 2007 | Jan. | 06 | 2008 | Jan. | 26 | 2009 | Dec. | 21 | 2009 |
| Feb. | 07 | 2007 | Jan. | 07 | 2008 | Feb. | 06 | 2009 | Dec. | 22 | 2009 |
| Feb. | 08 | 2007 | Jan. | 09 | 2008 | Feb. | 09 | 2009 | Dec. | 27 | 2009 |
| Feb. | 09 | 2007 | Jan. | 21 | 2008 | Feb. | 11 | 2009 | Dec. | 29 | 2009 |
| Feb. | 10 | 2007 | Jan. | 22 | 2008 | Feb. | 12 | 2009 | Dec. | 30 | 2009 |
| Feb. | 11 | 2007 | Jan. | 23 | 2008 | Feb. | 13 | 2009 | Jan. | 12 | 2010 |
| Feb. | 12 | 2007 | Jan. | 24 | 2008 | Feb. | 14 | 2009 | Jan. | 13 | 2010 |
| Feb. | 13 | 2007 | Jan. | 25 | 2008 | Feb. | 15 | 2009 | Jan. | 18 | 2010 |
| Feb. | 22 | 2007 | Jan. | 26 | 2008 | Feb. | 16 | 2009 | Jan. | 19 | 2010 |
| Feb. | 23 | 2007 | Jan. | 27 | 2008 | Feb. | 17 | 2009 | Jan. | 20 | 2010 |
| Feb. | 25 | 2007 | Jan. | 28 | 2008 | Feb. | 18 | 2009 | Jan. | 21 | 2010 |
| Feb. | 26 | 2007 | Jan. | 30 | 2008 | Feb. | 22 | 2009 | Jan. | 22 | 2010 |
| Feb. | 27 | 2007 | Feb. | 01 | 2008 | Feb. | 23 | 2009 | Jan. | 23 | 2010 |
| Feb. | 28 | 2007 | Feb. | 03 | 2008 | Feb. | 24 | 2009 | Jan. | 24 | 2010 |
| Mar. | 21 | 2007 | Feb. | 20 | 2008 | Feb. | 26 | 2009 | Jan. | 25 | 2010 |
| Mar. | 26 | 2007 | Feb. | 22 | 2008 | Mar. | 01 | 2009 | Jan. | 26 | 2010 |
| Mar. | 27 | 2007 | Feb. | 23 | 2008 | Mar. | 02 | 2009 | Jan. | 30 | 2010 |
| April | 11 | 2007 | Feb. | 24 | 2008 | Mar. | 03 | 2009 | Feb. | 03 | 2010 |
| April | 12 | 2007 | Feb. | 25 | 2008 | Mar. | 04 | 2009 | Feb. | 05 | 2010 |
| April | 14 | 2007 | Mar. | 13 | 2008 | Mar. | 05 | 2009 | Feb. | 06 | 2010 |
| April | 21 | 2007 | Mar. | 14 | 2008 | Mar. | 16 | 2009 | Feb. | 09 | 2010 |
| April | 22 | 2007 | Mar. | 15 | 2008 | Mar. | 22 | 2009 | Feb. | 21 | 2010 |
| May | 02 | 2007 | Mar. | 29 | 2008 | Mar. | 23 | 2009 | Feb. | 24 | 2010 |
| May | 03 | 2007 | Mar. | 30 | 2008 | April | 08 | 2009 | Feb. | 25 | 2010 |
| May | 04 | 2007 | April | 23 | 2008 | April | 09 | 2009 | Feb. | 27 | 2010 |
| June | 06 | 2007 | May | 24 | 2008 | April | 10 | 2009 | Feb. | 28 | 2010 |
| Sept. | 20 | 2007 | May | 25 | 2008 | April | 11 | 2009 | Mar. | 03 | 2010 |
| Sept. | 23 | 2007 | Oct. | 04 | 2008 | May | 02 | 2009 | Mar. | 04 | 2010 |
| Sept. | 24 | 2007 | Oct. | 31 | 2008 | May | 03 | 2009 | Mar. | 09 | 2010 |

\* Dates gathered from publicly available rain and weather data collected at stations located near the
Facility.

**ATTACHMENT A**
**Notice of Intent to File Suit, WMGV (Grass Valley, CA)**
**Significant Rain Events,* August 9, 2006 – August 9, 2011**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Mar. | 10 | 2010 | Dec. | 20 | 2010 | Feb. | 12 | 2011 | April | 03 | 2011 |
| Mar. | 13 | 2010 | Dec. | 21 | 2010 | Feb. | 13 | 2011 | April | 04 | 2011 |
| Mar. | 25 | 2010 | Dec. | 22 | 2010 | Feb. | 14 | 2011 | April | 05 | 2011 |
| Mar. | 26 | 2010 | Dec. | 23 | 2010 | Feb. | 15 | 2011 | April | 06 | 2011 |
| Mar. | 30 | 2010 | Dec. | 26 | 2010 | Feb. | 16 | 2011 | April | 07 | 2011 |
| Mar. | 31 | 2010 | Dec. | 27 | 2010 | Feb. | 17 | 2011 | April | 08 | 2011 |
| April | 03 | 2010 | Dec. | 29 | 2010 | Feb. | 18 | 2011 | April | 09 | 2011 |
| April | 05 | 2010 | Jan. | 01 | 2011 | Feb. | 19 | 2011 | April | 10 | 2011 |
| April | 12 | 2010 | Jan. | 02 | 2011 | Feb. | 20 | 2011 | April | 11 | 2011 |
| April | 13 | 2010 | Jan. | 03 | 2011 | Feb. | 21 | 2011 | April | 12 | 2011 |
| April | 20 | 2010 | Jan. | 04 | 2011 | Feb. | 22 | 2011 | April | 13 | 2011 |
| April | 21 | 2010 | Jan. | 05 | 2011 | Feb. | 23 | 2011 | April | 16 | 2011 |
| April | 22 | 2010 | Jan. | 06 | 2011 | Feb. | 24 | 2011 | April | 17 | 2011 |
| April | 27 | 2010 | Jan. | 07 | 2011 | Feb. | 25 | 2011 | April | 18 | 2011 |
| April | 28 | 2010 | Jan. | 08 | 2011 | Feb. | 26 | 2011 | April | 19 | 2011 |
| April | 29 | 2010 | Jan. | 09 | 2011 | Feb. | 27 | 2011 | April | 20 | 2011 |
| April | 30 | 2010 | Jan. | 10 | 2011 | Feb. | 28 | 2011 | April | 23 | 2011 |
| May | 11 | 2010 | Jan. | 11 | 2011 | Mar. | 01 | 2011 | April | 24 | 2011 |
| May | 18 | 2010 | Jan. | 12 | 2011 | Mar. | 02 | 2011 | April | 25 | 2011 |
| May | 26 | 2010 | Jan. | 13 | 2011 | Mar. | 03 | 2011 | April | 26 | 2011 |
| May | 27 | 2010 | Jan. | 14 | 2011 | Mar. | 04 | 2011 | May | 01 | 2011 |
| May | 28 | 2010 | Jan. | 15 | 2011 | Mar. | 05 | 2011 | May | 02 | 2011 |
| Oct. | 06 | 2010 | Jan. | 16 | 2011 | Mar. | 06 | 2011 | May | 06 | 2011 |
| Oct. | 23 | 2010 | Jan. | 17 | 2011 | Mar. | 07 | 2011 | May | 16 | 2011 |
| Oct. | 24 | 2010 | Jan. | 18 | 2011 | Mar. | 08 | 2011 | May | 31 | 2011 |
| Oct. | 25 | 2010 | Jan. | 19 | 2011 | Mar. | 09 | 2011 | | | |
| Oct. | 31 | 2010 | Jan. | 20 | 2011 | Mar. | 10 | 2011 | | | |
| Nov. | 07 | 2010 | Jan. | 21 | 2011 | Mar. | 11 | 2011 | | | |
| Nov. | 08 | 2010 | Jan. | 22 | 2011 | Mar. | 12 | 2011 | | | |
| Nov. | 10 | 2010 | Jan. | 23 | 2011 | Mar. | 13 | 2011 | | | |
| Nov. | 20 | 2010 | Jan. | 24 | 2011 | Mar. | 14 | 2011 | | | |
| Nov. | 21 | 2010 | Jan. | 25 | 2011 | Mar. | 15 | 2011 | | | |
| Nov. | 22 | 2010 | Jan. | 26 | 2011 | Mar. | 16 | 2011 | | | |
| Nov. | 23 | 2010 | Jan. | 27 | 2011 | Mar. | 17 | 2011 | | | |
| Nov. | 24 | 2010 | Jan. | 28 | 2011 | Mar. | 18 | 2011 | | | |
| Nov. | 27 | 2010 | Jan. | 29 | 2011 | Mar. | 19 | 2011 | | | |
| Nov. | 28 | 2010 | Jan. | 30 | 2011 | Mar. | 20 | 2011 | | | |
| Dec. | 03 | 2010 | Jan. | 31 | 2011 | Mar. | 21 | 2011 | | | |
| Dec. | 05 | 2010 | Feb. | 01 | 2011 | Mar. | 22 | 2011 | | | |
| Dec. | 06 | 2010 | Feb. | 02 | 2011 | Mar. | 23 | 2011 | | | |
| Dec. | 08 | 2010 | Feb. | 03 | 2011 | Mar. | 24 | 2011 | | | |
| Dec. | 09 | 2010 | Feb. | 04 | 2011 | Mar. | 25 | 2011 | | | |
| Dec. | 10 | 2010 | Feb. | 05 | 2011 | Mar. | 26 | 2011 | | | |
| Dec. | 11 | 2010 | Feb. | 06 | 2011 | Mar. | 27 | 2011 | | | |
| Dec. | 14 | 2010 | Feb. | 07 | 2011 | Mar. | 28 | 2011 | | | |
| Dec. | 15 | 2010 | Feb. | 08 | 2011 | Mar. | 30 | 2011 | | | |
| Dec. | 17 | 2010 | Feb. | 09 | 2011 | Mar. | 31 | 2011 | | | |
| Dec. | 18 | 2010 | Feb. | 10 | 2011 | April | 01 | 2011 | | | |
| Dec. | 19 | 2010 | Feb. | 11 | 2011 | April | 02 | 2011 | | | |

* Dates gathered from publicly available rain and weather data collected at stations located near the Facility.